State of New York v Justin (2003 NY Slip Op 23974)

State of New York v Justin

2003 NY Slip Op 23974 [3 Misc 3d 973]

November 19, 2003

Supreme Court, Erie County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 18, 2004

[*1]
State of New York, Plaintiff,
v
Todd J. Justin et al., Defendants.
Supreme Court, Erie County, November 19, 2003

APPEARANCES OF COUNSEL

Frank T. Gaglione, P.C., Amherst, for Todd J. Justin and others, defendants. Winget, Spadafora & Schwartzberg, LLP, New York City (Luigi Spadafora of counsel), for Financial Network Investment Corporation, defendant. Grashow & Bakshi, Williamsville (Murray J. Grashow of counsel), for Robert Mueller, defendant. Harter, Secrest & Emery, Buffalo (Karen R. Kaczmarski of counsel), for Michael B. Crystal, defendant. Jaeckle, Fleischman & Mugel, LLP, Buffalo (Charles C. Swanekamp of counsel), for David M. Sada and others, defendants. Jay J. Gianni, defendant pro se. Mary Beth Gianni, defendant pro se. Eliot Spitzer, Attorney General, Buffalo (Dennis Rosen of counsel), for plaintiff.

{**3 Misc 3d at 975} OPINION OF THE COURT

Joseph G. Makowski, J.
{**3 Misc 3d at 976}This matter comes before the court on motions to dismiss or for summary judgment by several defendants.
IDefendants Todd J. Justin, Todd J. Justin Agency, Inc., Alan J. Justin, Sr., Goldome Capital Management Inc., Alan J. Justin, Jr., Justin Financial Services, Inc., Eric J. Justin, E. Jonathan & Company, Inc., Patrick J. Justin, and Pat Justin Agency, Inc. (the Justin defendants) move for summary judgment pursuant to CPLR 3212 dismissing the complaint against them.
IIDefendant Financial Network Investment Corporation (hereafter FNIC) moves to dismiss the complaint pursuant to CPLR 3211 (a) (7), as asserted against it, for failure to state a claim upon which relief may be granted.
In addition, the following defendants join in the motions of FNIC and of the Justin defendants: defendants Ronald Mueller, Michael B. Crystal, David M. Sada, D.M. Sada, Inc., Michele Sada, Yun C. Coughlin, Jae-Yung, Inc., Jay J. Gianni, Mary Beth Gianni and Gianni Financial Services, Inc.[FN1]

For the reasons that follow, the court denies both motions. Further, upon searching the record pursuant to CPLR 3212 (b), the court determines that, as a matter of law, the ETS Program (as hereinafter defined) constituted a security under section 352 (1) of the Martin Act (General Business Law art 23-A).

Introduction

The Attorney General on behalf of the State of New York brought the instant action pursuant to General Business Law § 353, Executive Law § 63 (12), and General Business Law § 349-c. Plaintiff seeks to permanently enjoin defendants, their agents, and employees from offering for sale or selling securities to the public within or from the State of New York as principals, brokers, or agents. In addition, the State seeks restitution for investors in a certain program offered by ETS Payphones, Inc. (ETS).[FN2]

ETS filed a voluntary petition in bankruptcy on [*2]September 11, 2000 (complaint ¶ 6). According to plaintiff, between {**3 Misc 3d at 977}August 1998 and September 2000, defendants engaged in a fraudulent scheme to sell a highly risky investment program involving coin operated pay phones[FN3]

through ETS, and reaped undisclosed commissions of 18% on each sale. With the exception of defendant FNIC, the remaining defendants allegedly solicited (or profited from the solicitation of) approximately $18,500,000 from approximately 667 western New Yorkers, the majority of whom are 65 years of age or older (Rosen affirmation ¶ 6).[FN4]

When ETS filed for bankruptcy, those investors ceased receiving monthly "lease" payments from ETS. However, plaintiff procured a settlement to reimburse approximately half of the 667 western New York investors for 70% of their investments, to be paid by National Planning Corporation (NPC), a California-based securities broker-dealer with whom defendant Justin Financial Services, Inc. became associated in May 1999 (Rosen affirmation ¶¶ 33, 44). The settlement obtained by plaintiff pertains only to sales by certain individual defendants while they were licensed to sell securities through NPC (id. ¶ 44). The picture with respect to the remaining investorswho presumably filed claims in the ETS bankruptcyis uncertain. The record establishes that many of those investors are senior citizens and some had been encouraged by defendants to liquidate Individual Retirement Accounts or annuities (sometimes with a penalty) in order to invest in the ETS Program (see Rosen affirmation ¶¶ 26, 39). ETS has emerged from bankruptcy but, according to counsel for the former Unsecured Creditors' Committee in the bankruptcy, the over 300 remaining western New York investors are expected to recoup no more than 6% to 16% of their investment from the "reorganized" ETS.
Plaintiff alleges that defendants engaged in fraudulent practices in the sale of securities. Fraudulent practices under the Martin Act (General Business Law art 23-A) include the making of negligent and/or intentional material misrepresentations or omissions in the selling of securities, as well as the failure by the issuer and the salespeople to comply with registration requirements {**3 Misc 3d at 978}(see General Business Law § 352 [1] [defining fraudulent practices]; § 353 [1]; § 359-e [3] [required registration statements]).[FN5]

In addition, plaintiff contends that all of the defendants engaged in [*3]repeated or persistent fraudulent business activities in violation of Executive Law § 63 (12) and also are subject to penalties under General Business Law § 349-c, to the extent that their victims are 65 years of age or older.
The background is as follows:

1. The Parties

The core defendants are a group of family businesses. The Justin defendants include Alan Justin, Sr., who is the father of defendants Todd Justin, Alan Justin, Jr., Eric J. Justin, and Patrick Justin. Each of the sons has his own corporation, all defendants {**3 Misc 3d at 979}as well.[FN6]

Most notably, Alan Justin, Jr. is president of Justin Financial Services. For a time, JFS served as a branch office for two broker-dealers: first, defendant FNIC and later NPC. Alan Justin, Sr. is the president of and one of two shareholders (along with Todd J. Justin) of Goldome Capital Management Inc. (GCM), which was formerly known as Viacom Settlement Group, Inc.[FN7]

[*4]According to plaintiff, GCM's sole purpose shortly after its formation was to sell the ETS Program. All of the individual defendants except Alan Justin, Sr. and Alan Justin, Jr. personally sold the ETS Program to investors on behalf of GCM and received commissions (complaint ¶ 15).[FN8]

Alan Justin, Sr. and his four sons are licensed insurance agents; Alan Justin, Jr., Eric J. Justin, and Patrick Justin were also, during relevant time periods, registered as securities salespersons. Among the remaining defendants involved in these motions, Jay Gianni, David Sada, Yun C. Coughlin, and Ronald H. Mueller were all registered as securities salespersons and licensed insurance agents (complaint ¶¶ 12, 14, 16, 18, 20, 22, 25, 28, 30).
FNIC is a securities broker-dealer with its principal place of business in California (complaint ¶¶ 36, 68). It was purchased in 1997 by Aetna Retirement Services, a subsidiary of Aetna, Inc. (complaint ¶ 36). FNIC is duly registered with the State of New York (id.). Alan Justin, Jr., Eric J. Justin, Patrick Justin, Jay Gianni, David Sada and Yun Coughlin (hereafter FNIC individual defendants) were registered as FNIC sales agents from November 1998 until May 13, 1999 (id.; FNIC mem of law at 2). The JFS office in Depew served for that time as an FNIC branch office (complaint ¶ 69). On or about May 14, 1999, Alan Justin, Jr. terminated the relationship between FNIC and JFS (complaint ¶ 92). Immediately thereafter, JFS became a branch office of NPC, a broker-dealer registered to do business in New York with a principal place of business in California. Alan Justin, Jr. remained the branch manager and he and the other FNIC {**3 Misc 3d at 980}individual defendants became registered as NPC securities salespeople (complaint ¶¶ 93-95). NPC also agreed to permit those defendants to sell the ETS Program as an "outside business activity" while serving as registered salespeople for NPC (complaint ¶ 97).[FN9] 

(As will be explained infra, FNIC had refused to permit such outside sales.) JFS acted as a branch office for NPC from May 1999 through September 2000 (Rosen affirmation ¶ 44). Further facts concerning the relationship between FNIC and the individual defendants who were registered securities salespeople will be related in the second half of this decision.

2. The Allegations

Plaintiff describes the alleged securities sold by defendants as follows:
"Defendants sold the investment in seven thousand dollar [$7,000] units. Each unit involved the purchase of a payphone from [ETS], which sold the phones [*5]through distributors. The investor never took possession of the payphones, but received, simultaneously with his/her purchase, a site lease and leaseback and buyback agreement with ETS. ETS agreed to: maintain and operate the phones; make monthly payments to investors of $82.00 per phone, totaling 14.06% annually; buy back the investor's payphones for the original purchase price any time after six months, and, at the end of the five-year contract period, at the investor's option, renew the agreement or buy back the investor's payphones for the original purchase price. The defendants and ETS referred to this as the Payphone Equipment Lease Program ('ETS Program')." (Complaint ¶ 3.)
According to plaintiff, all of the defendants except FNIC engaged in the following fraudulent conduct under General Business {**3 Misc 3d at 981}Law article 23-A. Initially, the offering for sale of the ETS Program constituted an offering of securities, the issuer of which, ETS, was not registered with the State as required by General Business Law § 359-e (complaint ¶ 5). The majority of the investors were allegedly unsuitable for this type of "questionable, high risk" investment because of their advanced age, limited financial means, lack of investment experience, and/or aversion to risk (id.). Further, defendants allegedly made material misrepresentations to investors, such as stating that the promised monthly lease payments were guaranteed. Defendants allegedly failed to disclose material information, including, but not limited to, the fact that their commissions were 18%. Defendants also allegedly failed to disclose any risks associated with investing in the ETS Program, including "the [absence] of any reliable financial information pertaining to ETS, and the challenge to the payphone business posed by cell phones" (complaint ¶ 5).
In support of the motion for summary judgment, the Justin defendants submit copies of the purchase orders used by the Justin defendants and others to sell the ETS Program to investors (Gaglione affirmation, exhibits D, E). The bill of sale and purchase agreement list National Communications Marketing, Inc. (NCMI) as the seller (Gaglione affirmation, exhibit D). NCMI sales literature told potential purchasers that they had three options upon signing the contract to purchase the pay phone: to maintain the phone(s) themselves; to hire a maintenance company such as ETS to service the phones in the "Turn Key Maintenance Program"; or to lease the phone to ETS "or another telephone servicing company" (Gaglione affirmation, exhibit E).
Under the ETS leasing program, as described in ETS literature, ETS serviced the telephones and (allegedly) took the risk of unprofitability of the phones, and, at the end of the lease, the purchaser had three options: to take possession of the phone and self-service it; to enter into another five-year lease (which occurred automatically absent notice otherwise); or to sell the telephone to ETS for the original purchase price (see Gaglione affirmation, exhibit F, at 4-7 [ETS Feb. 1999 Information for Prospective Owner/Lessors and internal exhibit B]; see also Alan Justin, Sr. affidavit ¶¶ 2-10). Alan Justin, Sr. further alleges that the sale/leaseback option was "the most widely used" and that NCMI "generally recommended ETS" to investors (Alan Justin, Sr. affidavit ¶¶ 6-8). In fact, the evidence submitted{**3 Misc 3d at 982} indicates that all of the phones sold by defendants were leased back to ETS.
Defendants submit what they deem to be "promotional material provided by ETS to the [*6]purchasers," without proof that any of the investors here received these materials.[FN10]

A three-page document entitled "the most often asked questions and answers about the ets payphone equipment lease program" states that, in the ETS Program, "[t]he payphone owner purchases the 'smart' payphone from an independent Marketing Group that will handle all the leasing arrangements with ETS" (Gaglione affirmation, exhibit F, "Q & A" at 1). However, plaintiff alleges that the sellers of pay phones received their phones from an ETS affiliate or an entity ETS controlled (see Rosen affirmation ¶¶ 7, 38).[FN11]

Rosen states:
"Both the Gaglione [affirmation] and the [Alan Justin, Sr. affidavit] attempt to create the false impression that the ETS Program was not an investment contract, because the purchase of a payphone by an investor from . . . [NCMI] involved a separate, discrete transaction that was unrelated to the investor's subsequent leasing of the payphone to ETS. They state that: ETS was merely one of a number of companies with which NCMI was 'familiar' but that 'NCMI agents generally recommended ETS because NCMI . . . was satisfied that ETS was a reputable telephone company.' (Alan Justin Sr. Affid. ¶¶ 7-8); and '[a]fter purchasing the equipment some customers of the defendants elected to lease the equipment for five years with a telephone servicing company such as ETS Payphones' (Gaglione Affirm. ¶ 5). In fact, NCMI obtained its phones through ETS or a subsidiary of ETS, and every one of the NCMI phone sales agreements made to the 667 Buffalo-area investors involved the simultaneous agreement of the investor to lease it to ETS." (Rosen affirmation ¶ 38 [emphasis added].)
{**3 Misc 3d at 983}Other than the Rosen affirmation, there is no admissible proof on this record whether NCMI has any corporate or other relationship with ETS. However, the Eleventh Circuit decision in Securities & Exch. Commn. v ETS Payphones, Inc. (300 F3d 1281 [11th Cir 2002], cert granted 538 US 976 [2003]) states that PSA, Inc., an entity related to ETS, purchased pay phones and locations for pay phones for resale to "distributors" (id. at 1282).[FN12]

[*7]
Sales of the ETS Program were numerous. Those attributed to only one of the defendants, Jay Gianni, include 225 contracts, or nearly $7,000,000 in investments at an 18% commission. The commissions allegedly were split between the salespeople and GCM, the latter of which was wholly owned by Alan Justin, Sr. and Todd Justin (complaint ¶¶ 56, 58).
Alan Justin, Sr. further alleges that
"Every lease contract is maintained as a separate account by ETS. There is no 'pooling' of equipment for a number of joint owners, nor is there any 'pooling' of revenues to be divided among owners. Instead, the payphone owner has his own specific phone and his own specific account. The owner always owns an installed tangible piece of equipment together with the lease from the property owner/operator for the operation of his equipment. Should ETS ever experience any type of financial difficulty, this equipment is owned by the individual and is his equipment. He may assume full operational control of it at any time. At no time can ETS impair his ownership of the equipment . . . 
"Upon information and belief, the COCOTS consumers still hold title to the COCOTS [after the bankruptcy] and ETS intends to continue to operate COCOTS for consumers. In addition, it is anticipated that consumers will receive additional remuneration as creditors under the ETS Plan of Reorganization" (Alan Justin, Sr. affidavit ¶¶ 9, 16).
Further, according to the Justin defendants' memorandum of law, {**3 Misc 3d at 984}"consumers" of the ETS Program "have suffered no compensable loss" (mem of law at 11).
Neither the affidavit of Alan Justin, Sr. nor the Justin defendants' memorandum of law demonstrates any personal knowledge of the details of the bankruptcy plan or the state of investors' reimbursement. Further, their allegations are directly contradicted by information supplied by Kirk Brett, counsel for the former Official Committee of Unsecured Creditors in the ETS and a related entity chapter 11 bankruptcy. Brett avers that a joint plan of reorganization for ETS was confirmed by the bankruptcy court in November 2001 and effectuated on December 5, 2002 (Brett affidavit ¶ 9). Under the plan:
"Six million shares of stock of Reorganized ETS are authorized to be issued but only five million shares have actually been issued . . .
"All issued shares of stock of Reorganized ETS have been issued for Payphone Investors, with such shares being allocated on a pro rata basis according to the amount of each Payphone Investor's claim" (Brett affidavit ¶ 9).
In addition, a litigation trust was created and any causes of action against the former CEO of ETS, Charles Edwards, have been transferred to that trust, the net proceeds of which (if any) will be distributed 85% to pay phone investors and 15% to other unsecured creditors. Finally, "Payphone Investors shall not be deemed to 'own' any of the payphones that were originally part of the sale/leaseback transactions" (Brett [*8]affidavit ¶ 9).[FN13]

Brett summarizes the position of pay phone investors as follows:
"Based upon my knowledge of the ETS bankruptcy cases and the terms of the confirmed and consummated plan of reorganization, I am quite certain that the [investors in the ETS Program] have suffered a tremendous loss. In fact, the joint plan of reorganization did not provide any immediate cash payments to the Payphone Investors, but instead provided for the distribution of shares of stock and a beneficial interest in a litigation trust, and it was estimated that the Payphone Investors would recover{**3 Misc 3d at 985} between 6 and 26 percent of their claims. As described in greater detail below, I continue to believe that this estimate is appropriate. Accordingly, the notion that Payphone Investors have not suffered any loss is entirely wrong." (Brett affidavit ¶ 2.)
The instant complaint was filed in June 2002. In July 2002, FNIC removed the action to the United States District Court for the Western District of New York and also filed a motion to dismiss in that court. Plaintiff cross-moved for a remand and, in November 2002, the District Court granted plaintiff's motion, holding that the complaint raised no substantial federal question. The case was remanded to this court (State of New York v Justin, 237 F Supp 2d 368 [WD NY 2002]), whereupon the instant motions were filed.

Justin Defendants' Motion for Summary Judgment

The Justin defendants move for summary judgment in light of the holdings of the United States Court of Appeals for the Eleventh Circuit in Securities & Exch. Commn. v ETS Payphones, Inc. (300 F3d 1281 [11th Cir 2002], cert granted 538 US 976 [2003]), that the ETS Program as brokered or sold by defendants was not a "security" under federal law, nor did the operations of ETS constitute a "Ponzi" scheme. Specifically, the Justin defendants contend that a customer's purchase of a pay phone from NCMI, regardless of whether ETS later became involved as a lessee and/or service provider, may not be characterized as a security under the Martin Act because it was not an "investment contract," as defined under federal law and adopted by New York courts. The Justin defendants allege that the contracts are not investment contracts because there was no "common enterprise," investors' promised return was contractually guaranteed, and the investments were not passive (mem of law at 13, 16-22).
Plaintiff's primary position is that the ETS Program constituted the sale of a "security" under the Martin Act (General Business Law art 23-A, § 352). Other state courts have determined that the ETS Program constituted a "security" under the relevant state law (see State of Iowa ex rel. Miller v Pace, Iowa Dist Ct, Sept. 2002, Equity IA26445, slip op, at 18 [attached to plaintiff's mem of law in Justin motion] [sale of pay phone and leaseback contract constituted an [*9]investment contract and thus a security under state law]; Justice v Gardner,{**3 Misc 3d at 986} 2002 WL 31169773, *3, 2002 Conn Super LEXIS 2828, *8 [Conn Super Ct, Waterbury, Aug. 23, 2002] [same]). A number of state securities regulators have so found (see Matter of ETS Payphones Inc., 2001 WL 422179, 2001 Ala Sec LEXIS 4 [Ala Sec Commn, Feb. 6, 2001] [preliminary findings]; Matter of Zanowski, 2000 WL 1847107, 2000 Ariz Sec LEXIS 51 [Ariz Corp Commn, Nov. 30, 2002]; State of Fla. Dept. of Banking & Fin., Div. of Sec. v ETS Payphones, Inc., 2002 WL 31453061, 2002 Fla Sec LEXIS 120 [Fla Dept of Banking & Fin, Oct. 31, 2002]; Matter of National Communications Mktg., Inc., 1998 WL 704697 [Kan Off of Sec Commr, Sept. 25, 1998] [allegations only]; Matter of Rahaim, 2000 WL 1617638, 2000 Mass Sec LEXIS 4 [Mass Sec Div, Apr. 10, 2000]; Matter of Helton, 2001 WL 1193030, 2001 Mo Sec LEXIS 35 [Mo Div of Sec, Oct. 2, 2001]; Matter of Fleming, 2002 WL 1578779, 2002 Ohio Sec LEXIS 158 [Ohio Dept Commerce, May 15, 2002]; Matter of Fecht, 2002 WL 927153, 2002 Tex Sec LEXIS 13 [Tex Sec Bd, Apr. 24, 2002]; Matter of National Communications Mktg., Inc., 2002 WL 31455414 [Wash Sec Div, Oct. 31, 2002]; see also Washington Sq. Sec., Inc. v Aune, 253 F Supp 2d 839, 845 n 6 [WD NC 2003] [plaintiffs alleged that securities regulators in at least 16 states have determined that ETS investments are securities]).
Initially, the issues before the court are (1) whether the ETS Program constitutes an "investment contract," and (2) whether the ETS Program constitutes a "security" under the Martin Act. The court notes that the United States Supreme Court has granted certiorari in the Eleventh Circuit ETS case, but no decision is expected for some time. In any event, what is deemed a security under the Martin Act will not necessarily be deemed a security under the federal statutes. For the reasons recited below, the court determines that, as a matter of law, the ETS Program constitutes an investment contract and, further, also constitutes a security within the meaning of the Martin Act. Accordingly, after searching the record, the court determines that plaintiff is entitled to summary judgment on that issue. Further, the Justin defendants' motion for summary judgment dismissing the first through sixth causes of action and the eighth through tenth causes of action, based upon violations of the Martin Act, is denied.

Blue Sky Laws

The Court of Appeals recognized in 1986 that "New York's Blue Sky Law [the Martin Act, General Business Law art 23-A] . . . should {**3 Misc 3d at 987}be liberally construed to give effect to its remedial purpose of protecting the public from fraudulent exploitation in the offer and sale of securities . . . ." (All Seasons Resorts v Abrams, 68 NY2d 81, 86-87 [1986].) The Martin Act and the federal acts have been held to be
"virtually identical in their design and scope, and the purpose for which they were enacted. Both are intended to be used in the prevention of the various kinds of deceptive practices and fraudulent schemes which have developed side by side with the growth of the securities industry. Both the Martin Act with its related provisions, and the Securities Act with its related provisions, in order to be effective in providing a remedy . . . must not be strictly interpreted but should be given a pliable yet resilient construction enabling them to be applied to individual situations in a manner which best fulfills their beneficial purpose. Given a degree of flexibility, the Attorney-General and the Securities and Exchange Commission can effectively enforce each law through regulations in keeping with their underlying purpose."[*10] (Matter of Gardner, 97 Misc 2d 806, 812-813 [Sup Ct, NY County 1978].)
The types of transactions covered by the Martin Act provisions at issue are listed in General Business Law § 352. That section provides in part that the Attorney General may investigate fraudulent practices in the "issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state, of any stocks, bonds, notes, evidences of interest . . . or other securities" (id. § 352 [1] [emphasis supplied]).
The Court of Appeals has found "investment contracts" to be included within the definition of "other securities" under section 352 (1) of the Martin Act (see People v Landes, 84 NY2d 655, 660 n 1 [1994]; All Seasons Resorts, 68 NY2d at 91-92). In defining the term "investment contract," New York courts have followed Securities & Exch. Commn. v Howey (328 US 293 [1946]), the seminal case under the Securities Act of 1933 (15 USC § 77a et seq.), that establishes a test for the existence of such a contract.
"The term 'investment contract' is undefined by the Securities Act or by relevant legislative reports. But the term was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute {**3 Misc 3d at 988}and, although the term was also undefined by the state laws, it had been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment' . . . This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves" (Howey, 328 US at 298 [emphasis supplied]).
Thus, under federal law, a transaction is an investment contract where, disregarding form over substance, it (1) involves an investment (2) in a common enterprise (3) with a reasonable expectation of profits (4) to be derived solely from the entrepreneurial or managerial efforts of the promoter (see Howey, 328 US at 298; Pace, slip op, at 9, Rosen affirmation, exhibit E). Although the test is easy to state, in practice it is difficult to apply. That may be because, as opined by one commentator, "investment contract" is not a term normally employed in the commercial context; rather, it is a legal construct (L. Soderquist, Reach of Securities Act Registration: What is a Security?, 1374 PLI/Corp 173, 177 [May 2003]).
In the case heavily relied upon by the Justin defendants, Securities & Exch. Commn. v ETS Payphones, Inc. (300 F3d 1281), the Eleventh Circuit reviewed the granting of a preliminary injunction against the founder, CEO, and majority stockholder of ETS, Charles E. Edwards (id. at 1282). The Securities and Exchange Commission (SEC) had sought an injunction barring Edwards from future violations of the securities law and the freezing of his personal assets (id.). In considering whether the court had subject matter jurisdiction, i.e., whether the ETS Program was a "security" under federal securities laws, the Eleventh Circuit discussed the application of the Howey test. The court found that it was apparent that pay phone investors had made an "investment" (the first criterion) (id. at 1284). The court found it unnecessary to consider the application of the second criterion, the existence of a "common enterprise" because it determined that the final criterion, "expectation of profits {**3 Misc 3d at 989}solely from the efforts of others" was clearly unsatisfied (id. at 1284-[*11]1285). The court therefore reversed and remanded, directing a dismissal of the SEC's complaint (id. at 1285).
This court applies its own analysis on the record before it.

1. Investment Contract

Although the first criterion, that the pay phone investors made an "investment," is conceded, a more important question is whether there was a single transaction involvedor whether the court must consider the sale of a phone to investors by NCMI and the lease to ETS as separate transactions. Defendants contend in effect that a simple lease of a telephone, after the initial purchase of the telephone, would not constitute a security.
However, the court determines that defendants have failed to establish as a matter of law that the ETS Program was not, in practice, sold as a single transaction. There is no admissible proof (other than affidavits not shown to be based upon personal knowledge in this particular) that NCMI was an independent entity unconnected with ETS. The court notes that the Eleventh Circuit in Securities & Exch. Commn. v ETS Payphones found that the pay phones in the ETS Program were purchased by an entity related to ETS and sold to distributors. That related entity was presumably PSA, Inc., which filed for bankruptcy along with ETS. Further, the phones ordered through the NCMI purchase orders were shipped, by those orders, directly to ETS (see Rosen affirmation ¶ 38).
For the 667 western New York investors, the plaintiff has established that the ETS Program was marketed and sold as a single transaction. Thus, although investors allegedly "owned" a telephone, a "location" for that phone and the use of telephone wires, the "ownership" piece was, as in Howey (which dealt with portions of a citrus grove), merely "a convenient method of determining the investors' allocable shares of the profits," while the transfer of "ownership" of the phones, in this case, or the shares of the orange grove in Howey, was "purely incidental" (Howey, 328 US at 300).

2. Common Enterprise

The second criterion under Howey concerns whether the investors were involved in a common enterprise. There is a split among the federal circuit courts of appeals and state courts concerning the definition of what constitutes a common enterprise. {**3 Misc 3d at 990}The Justin defendants contend that, regardless of the standard applied, the ETS Program does not meet the criterion (Justin mem of law at 14). The court disagrees.
A brief discussion of the split of authority is necessary. As stated by the Eleventh Circuit in ETS Payphones, most federal circuits that have considered the "common enterprise" criterion "find it satisfied where a movant shows 'horizontal commonality,' that is the 'pooling' of investors' funds as a result of which the individual investors share all the risks and benefits of the business enterprise" (Securities & Exch. Commn. v ETS Payphones, 300 F3d at 1284, citing, e.g., United States Sec. & Exch. Commn. v Infinity Group Co., 212 F3d 180, 188 [3d Cir 2000], cert denied 532 US 905 [2001]; Securities & Exch. Commn. v Banner Fund Intl., 211 F3d 602, 614-615 [DC Cir 2000]; Teague v Bakker, 35 F3d 978, 986 n 8 [4th Cir 1994], cert denied 513 US 1153 [1995]). The Second Circuit Court of Appeals is in that group (see Revak v SEC Realty Corp., 18 F3d 81, 87-89 [2d Cir 1994]).
New York State courts, however, have adopted a less restrictive criterion of "broadly vertical commonality" (see People v First Meridian Planning Corp., 86 NY2d 608, 620 [1995]). The criterion is explicated in the Third Department's decision in that case, affirmed by the Court [*12]of Appeals, as requiring "only that the fortunes of the investor be linked to the efforts of the promoter but not that the promoter's fortunes be so linked. That is, there must be a direct nexus between the efforts of the promoter and the return on the investor's investment" (People v First Meridian Planning Corp., 201 AD2d 145, 152 [3d Dept 1994], affd 86 NY2d 608 [1995]). In affirming, the Court of Appeals stated that "[t]he common enterprise factor can be established by proof that 'the fortunes of all investors are inextricably tied to the efficacy [of those seeking the investment or a third party]' " (People v First Meridian Planning Corp., 86 NY2d at 620, quoting Securities & Exch. Commn. v Koscot Interplanetary, Inc., 497 F2d 473, 479 [5th Cir 1974]). The Court of Appeals noted that, in the Howey case, the United States Supreme Court "found that the common enterprise factor was established although investors purchased individual orange grove lots, rather than an interest in an undivided entire grove" (First Meridian, 86 NY2d at 620).
Applying the "broadly vertical commonality" criterion, this court determines that plaintiff has established as a matter of law that the ETS Program satisfied the common enterprise criterion, {**3 Misc 3d at 991}and there are no issues of fact. The court finds as a matter of law that there was a direct nexus between the efforts of ETS and the "fortunes" of the investors. Whether the investor received his or her "guaranteed" monthly payments depended entirely upon the efforts of ETS in servicing and maintaining the phones. The investor was entirely passive.
Thus, the ETS Program satisfies the second criterion of the Howey test.

3. Profits Solely from the Efforts of Others

The third and final criterion for an investment contract under Howey is that the investors must have had a reasonable expectation of "profits to be derived solely" from the efforts of ETS. The Justin defendants rely upon the analysis of the Eleventh Circuit Court of Appeals in ETS. The Eleventh Circuit determined that the concept of profits "has a limited meaning under federal securities law" (ETS Payphones, 300 F3d at 1284, citing United Hous. Found., Inc. v Forman, 421 US 837, 852 [1975], reh denied 423 US 884 [1975]). For example, the United States Supreme Court in Forman stated:
"By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . In such cases the investor is 'attracted solely by the prospects of a return' on his investment. Howey, supra, [328 US] at 300 . . . By contrast, when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply" (United Hous. Found. v Forman, 421 US at 852-853 [emphasis supplied]).
Plaintiff, on the other hand, contends that even assuming the term "profits" has that limited meaning under federal securities law, the Court of Appeals has defined the term more broadly in the context of the Martin Act.
The Eleventh Circuit held that the fixed lease payments promised to the ETS Program investors could not be considered either "capital appreciation" or "participation in earnings."
"Because the investors received a fixed monthly sum, the actual earnings of their telephone, or ETS, were irrelevant. ETS alone shouldered the risk of its placement of the telephones and ETS alone depended upon the earnings of its business. Thus, only ETS could reap profits as that term is understood{**3 Misc 3d at 992} under the federal securities law"[*13] (ETS Payphones, 300 F3d at 1285).
For the Eleventh Circuit, a further determining factor was that investors were entitled by contract to receive the monthly lease payments, and thus to receive returns irrespective of the efforts of ETS, and therefore the lease payments were not funds "derived solely from the efforts of others" (id. at 1285).
This court rejects the analysis of the Eleventh Circuit. Holders of stocks and bonds, for example, are entitled by contract to interest or dividends; that fact does not prevent those instruments from being securities. Merely because investors were promised a specific return each month should not remove the program from the scrutiny of state regulators. Clearly, the "guarantee" of a 14% return on investment was the very promise that "guaranteed" the resulting bankruptcy of ETS and the concomitant losses to investors.
Further, courts have found this criterion to be satisfied "by an expectation that the promoter will repurchase the object of the investment at a later date" (United States v Jones, 712 F2d 1316, 1322 [9th Cir 1983], cert denied sub nom. Webber v United States, 464 US 986 [1983]), as existed here (see Gaglione affirmation, exhibit F, at 7 [ETS Feb. 1999 "Information for Prospective Owner/Lessors," Alan Justin, Sr. affidavit ¶ 6).
Thus, the court finds every Howey criterion to be satisfied. The court determines that, as a matter of law, the ETS Program is an "investment contract" under Howey and, therefore, the transactions also constitute "securities" as defined in General Business Law § 352 (1). The court thus searches the record pursuant to CPLR 3212 (b) and grants summary judgment for plaintiff on the issue whether the ETS Program was a security under the Martin Act.

Executive Law Cause of Action

Executive Law § 63 (12) permits the Attorney General to bring a special proceeding for an order enjoining persons from business activities which involve "repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction" of the business. The court may also direct restitution and damages and, in an appropriate case, cancel any certificate under General Business Law § 130 (see Executive Law § 63 [12]; see generally People v Network Assoc., 195 Misc 2d 384, 389 [Sup Ct, NY County 2003] [collecting cases]).{**3 Misc 3d at 993}
On this record, the court finds a triable issue of fact whether sales by defendants of the ETS Program involved "repeated fraudulent or illegal acts . . . in the carrying on, conducting or transaction" of business (Executive Law § 63 [12]; see generally Matter of People v Telehublink Corp., 301 AD2d 1006 [3d Dept 2003]). The court therefore denies the motion for summary judgment with respect to the twelfth cause of action.

Consumer Fraud Against the Elderly

The thirteenth cause of action against all defendants alleges that the sales of the ETS Program constituted consumer fraud against the elderly pursuant to General Business Law § 349-c. That section provides that
"In addition to any liability for damages or a civil penalty imposed pursuant to [General Business Law §§ 349, 350-c and 350-d], regarding deceptive practices and false advertising, and [Executive Law § 63 (12)], . . . a person or entity who engages in any conduct prohibited by said provisions of law, and whose conduct is perpetrated against one or more elderly persons, may be liable for an additional civil penalty not to exceed ten thousand dollars, if the factors in paragraph (b) of this subdivision are present.
"(b) In determining whether to impose a supplemental civil penalty pursuant to paragraph (a) of this subdivision, and the amount of any such penalty, the court shall consider, in addition to other appropriate factors, the extent to which the following factors are present:
"(1) Whether the defendant knew that the defendant's conduct was directed to one or more elderly persons or whether the defendant's conduct was in willful disregard of the rights of an elderly person;
"(2) Whether the defendant's conduct caused an elderly person or persons to suffer . . . substantial loss of property set aside for retirement or for personal and family care and maintenance, substantial loss of payments received under a pension or retirement plan or a government benefits program; or assets essential to the health or welfare of the elderly person or whether one or more elderly persons were substantially more vulnerable to the defendant's conduct because of age, poor health, infirmity,{**3 Misc 3d at 994} impaired understanding, restricted mobility, or disability, and actually suffered physical, emotional, or economic damage resulting from the defendant's conduct." (General Business Law § 349-c [2] [a]-[b] [emphasis supplied].)
Plaintiff alleged that, of the 667 investors defrauded by defendants in western New York, a large percentage was over the age of 65, the definition of an elderly person under the statute (see id. [1]). The court determines that there is a triable issue of fact whether defendants' sales of the ETS Program fell within the purview of section 349-c. Therefore, summary judgment is denied as to the thirteenth cause of action.

Motion IIFNIC's Motion to Dismiss

FNIC contends that plaintiff has failed to state a cause of action against it (CPLR 3211 [a] [7]). The court must deny the motion if from the pleadings' "four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law" (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001] [internal quotation marks omitted]). The court must "liberally construe the complaint . . . and accept as true the facts alleged in the complaint and any submissions in opposition to the dismissal motion," according to plaintiff "the benefit of every possible favorable inference" (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002]). In addition, "[i]n assessing a motion under CPLR 3211 (a) (7), . . . a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint . . . and the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one" (Leon v Martinez, 84 NY2d 83, 88 [1994] [internal quotation marks omitted]).
The allegations related to the claims against FNIC are as follows. Justin Financial Services operated as a branch office for FNIC from sometime in the mid-1990s until May 1999. Alan Justin, Jr., Eric J. Justin, Patrick Justin, Jay Gianni, David Sada and Yun Coughlin were registered as FNIC sales agents from November 1998 until May 13, 1999. In November 1998, Alan Justin, Jr. requested from FNIC's home office that the FNIC individual defendants be permitted to sell the ETS Program as an "outside business activity." FNIC responded in December, denying permission and directing Alan Justin, Jr. to prohibit the other salespeople from any involvement in selling the ETS Program. However, the FNIC individual defendants had {**3 Misc 3d at 995}already been selling the ETS Program, and continued to sell the program after FNIC denied permission to do so (complaint ¶¶ 78-80). In May 1999, FNIC's home office directed Alan Justin, Jr. to have the FNIC individual defendants sign statements [*14]affirming that they were not "referring, selling or involved in any manner with any unapproved outside business activity including payphone programs" (complaint ¶ 83). The defendants at issue signed such statements, which were false (id. ¶¶ 85-87). On May 14, 1999, Alan Justin, Jr. terminated JFS's relationship with FNIC (id. ¶ 92).
Only three causes of action in the complaint are asserted against FNIC: the seventh, the twelfth, and the thirteenth. Each of them incorporates allegations that FNIC failed to adequately supervise the FNIC individual defendants, therefore failing to stop those defendants from "selling away" the ETS Program while working as registered securities salespeople for FNIC. The seventh cause of action alleges that FNIC's failure to adequately or reasonably supervise the FNIC individual defendants constituted a fraudulent practice in violation of General Business Law §§ 352 and 352-c (1) (complaint ¶¶ 185-191).[FN14]

Specifically, plaintiff alleges that, from October 1998 to May 1999, while the FNIC individual defendants were associated with FNIC, they sold the ETS Program to over 100 investors who paid approximately $3,411,000. Forty-two of those investors had also purchased a product through FNIC (in addition to purchasing the ETS Program) (complaint ¶ 142).
The twelfth cause of action alleges a violation of Executive Law § 63 (12), and the thirteenth cause of action alleges consumer fraud against the elderly in violation of General Business Law § 349-c.
The precise questions before the court are whether the State may seek remedies under the Martin Act and consumer fraud statutes {**3 Misc 3d at 996}based upon FNIC's breach of its duties as employer of the FNIC individual defendants and/or under 15 USC § 78o et seq., or as a "controlling person" under Securities Exchange Act of 1934 § 20 (a) (15 USC § 78t [a] [1934 Act]).

FNIC's Three Main Contentions

The court has already determined that the ETS Program constituted a "security" under the Martin Act. Thus, to the extent that FNIC seeks dismissal of the causes of action against it on the basis that no sales of securities were involved in the ETS Program, that contention is without merit.
Second, FNIC contends that the causes of action against it are preempted by 1934 Act § 20 (a) (15 USC § 78t [a]) and the rules and regulations promulgated pursuant to it by the SEC and the National Association of Securities Dealers (FNIC mem of law at 17-22; reply mem at 14-18). Specifically, FNIC asserts that neither the relevant provisions of the Martin Act (General Business Law §§ 352, 352-c [1]; § 353) nor the consumer protection statutes were enacted to [*15]regulate or even address the issue of a securities broker-dealer's failure to properly supervise its registered representatives (mem of law at 17). Further, FNIC asserts that plaintiff's state law causes of action are implicitly preempted by the 1934 Act and the rules and regulations promulgated under it (id.). In its reply memorandum, FNIC contends that plaintiff seeks to impose stricter standards of supervision upon FNIC under state law or otherwise than are imposed under the SEC or the NASD rules and regulations, thereby creating conflicting schemes of regulations, and necessitating a ruling that such state law claims are preempted (reply mem at 17-19). Underlying FNIC's arguments is its assertion that, because plaintiff has not accused it of "fraud," no cause of action can lie against it under the Martin Act.
Plaintiff, however, asserts that the combined federal and state statutory scheme demonstrates that this area of law has not been preempted by Congress. Plaintiff further contends that federal case law and NASD rules require that a broker-dealer exercise a "heightened" degree of supervision over its salespeople under certain circumstances and, therefore, to assert such a requirement under state law incorporates but does not conflict with federal standards (plaintiff's mem at 24).
These issues are difficult to resolve, in part because the parties have unearthed little authority directly on point. After due consideration, the court determines that FNIC failed to establish{**3 Misc 3d at 997} that the causes of action are preempted; rather, the State may seek remedies under the Martin Act and the consumer protection statutes against FNIC based solely upon FNIC's alleged failure to adequately supervise those of the defendants who acted as its salespeople.

Issues Decided by District Court

The analysis begins with the decision of the District Court remanding the instant matter to this court (see New York v Justin, 237 F Supp 2d 368 [WD NY 2002]). As noted earlier, FNIC removed the case to District Court in 2002. In response to plaintiff's motion in that court to dismiss for lack of subject matter jurisdiction, FNIC contended that federal question jurisdiction existed over the instant complaint. It alleged, first, that plaintiff's causes of action arose out of federal securities law and, second, because Congress allegedly had completely preempted the area of securities regulation at issue, that the causes of action were "necessarily federal" (New York v Justin, 237 F Supp 2d at 372).
With regard to the first point, the District Court determined that FNIC's duty to supervise its securities salespeople was "not solely a creature of federal law" (id. at 373). The court noted that section 20 (a) of the 1934 Act (15 USC § 78t [a]), which provides for "controlling person" liability,[FN15]

does not preclude resort to other theories of employer liability such as traditional agency principles (see New York v Justin, 237 F Supp 2d at 373). In so ruling, the District Court in New York v Justin relied upon section 28 (a) of the 1934 Act, which states that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies [*16]that may exist at law or in equity" (15 USC § 78bb [a]). The District Court went on to conclude:
"Thus, in fine federalist fashion, the 1934 Act was designed to supplement rights and duties created by state 'blue sky' laws, not supercede them. Accordingly, this Court finds that FNIC's duty to supervise its registered securities salespeople is neither created{**3 Misc 3d at 998} by, nor limited to, the provisions of the 1934 Act. The State of New York remains free to pursue other 'rights and remedies' against FNIC existing under state law" (New York v Justin, 237 F Supp 2d at 373 [emphasis supplied]; see Marbury Mgt., Inc. v Kohn, 629 F2d 705, 712 [2d Cir 1980], cert denied sub nom. Wood Walker & Co. v Marbury Mgt., Inc., 449 US 1011 [1980] [section 20 (a) was "enacted to expand rather than to restrict the scope of liability under the securities laws"]).
In a later footnote, the District Court narrowed the scope of its decision by noting that it was deciding only that FNIC's duty to supervise was "not necessarily limited to the provisions of federal law" (New York v Justin, 237 F Supp 2d at 373 n 6). The court noted that the state courts may determine that FNIC has no New York duty to supervise, but that the question must be "resolved by a New York court through construction of the plain language and history of the applicable provisions of New York law" (id.).
Further, on FNIC's second contention, the District Court determined that "federal securities law does not dominate the field so as to invoke the complete preemption 'exception' to the well-pleaded complaint rule," based on the District Court's determination that section 20 (a) does not have "extraordinary preemptive power sufficient to transform all state law claims . . . [concerning supervisory liability] into federal [claims]" (New York v Justin, 237 F Supp 2d at 375, 375 n 7). In so holding, the District Court did not reach the issue whether a New York court presented with the question could determine that federal regulations in the area of securities salesperson supervision are "pervasive enough to provide FNIC with a defense of pre-emption" (id. at 375 n 7; cf. Metropolitan Life Ins. Co. v Taylor, 481 US 58, 66 [1987] ["even an 'obvious' pre-emption defense does not, in most cases, create removal jurisdiction"]).

1. Supervision under the Martin Act

In determining that a failure by FNIC to exercise reasonable supervision over its securities salespeople in a branch office can be a violation of the Martin Act, this court relies upon the following. When passing securities legislation, Congress has always preserved a role for state "blue sky" laws, which predated the federal securities laws of the 1930s, including the Securities Act of 1933 and the Securities Exchange Act of 1934 (see Mihaly and Kaufmann, Introduction and Commentary Overview, {**3 Misc 3d at 999}Securities, Commodities and Other Investments, McKinney's Cons Laws of NY, Book 19, General Business Law art 23-A, at 11-12; see also Matter of Gardner v Lefkowitz, 97 Misc 2d 806, 812-813 [Sup Ct, NY County 1978]). Further, despite FNIC's allegation that the Martin Act does not specifically address the issue of broker-dealer supervision, section 353 clearly addresses secondary liability for securities fraud, providing that the Attorney General may seek relief for fraudulent practices against a perpetrator as well as "any other person or persons theretofore concerned in or in any way participating in or about to participate in such fraudulent practices" (General Business Law § 353 [1] [emphasis supplied]). Here, FNIC hired certain of the other defendants as its representatives and clothed them with the "good name" of a national broker-dealer. If, as alleged by plaintiff, FNIC failed to adequately train or supervise the individuals who operated with FNIC's express authority in selling other products, FNIC was necessarily "concerned in" the FNIC individual [*17]defendants' fraudulent outside sales practices.

2. Implied Conflict Preemption

Furthermore, a review of the scheme of federal, state and private securities regulations persuades the court that there is no implied conflict preemption in this area. Whether an area of regulation has been preempted by federal law is a question of congressional intent. The Court of Appeals provided the following summary of the doctrine:
"As recapitulated most recently in Barnett Bank [of Marion County, N.A. v Nelson, 517 US 25, 31 (1996)], congressional preemptive intent may be shown from express language in the Federal statute; it may also be established implicitly because the Federal legislation is so comprehensive in its scope that it is inferable that Congress wished fully to occupy the field of its subject matter ('field preemption'), or because State law conflicts with the Federal law. Implied conflict preemption may be found when it is impossible for one to act in compliance with both the Federal and State laws, or when 'the state law . . . "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ' " (Guice v Charles W. Schwab & Co., 89 NY2d 31, 39 [1996] [citations omitted]).
As noted, federal securities statutes contain a savings clause for state regulatory action (see 15 USC § 78bb [a]; see also 15 USC {**3 Misc 3d at 1000}§ 78bb [f] [4]). Thus, there is no express preemption. Further, as discussed below, plaintiff has not alleged any standards of broker liability for inadequate supervision that directly conflict with federal standards of broker liability.
With regard to implied conflict preemption, FNIC raises arguments based entirely on federal statutes and on NASD regulations; FNIC neither cites nor relies upon any SEC regulations or rules.
The federal duty to supervise derives from section 78o, which provides in pertinent part:
"(4) The [SEC], by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds . . . that such [penalty] is in the public interest and that such broker or dealer, whether prior or subsequent to becoming such, or any person associated with such broker or dealer, whether prior or subsequent to becoming so associated . . .
"(E) has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any other person of any provision of the Securities Act of 1933 [or certain other federal statutes], this chapter, the rules or regulations under any of such statutes, . . . or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision. For the purposes of this subparagraph (E) no person shall be deemed to have failed reasonably to supervise any other person, if
"(i) there have been established procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, any such violation by such other person, and
[*18] "(ii) such person has reasonably discharged the duties and obligations incumbent upon him by reason of such procedures and system without reasonable cause to believe that such procedures and system were not being complied with." (15 USC § 78o [b] [4] [E] [emphasis supplied].)
The NASD is a private association of securities broker-dealers registered with the SEC. Pursuant to statute, the NASD has the authority {**3 Misc 3d at 1001}to issue rules and regulations to govern the business of its members and also to prosecute members and their employees.
"The rules of the [NASD] are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest . . ." in over-the-counter securities markets (15 USC § 78o-3 [b] [6]; see In re Wolf Fin. Group, Inc., 1994 WL 913278, *5-7, 1994 Bankr LEXIS 2350 [Bankr SD NY, Dec. 15, 1994]). Although NASD rules must be approved by the SEC (see 15 USC § 78s [b], [c]), they remain standards developed by a private broker-dealers' association for regulating its members. The specific rules upon which both parties rely are NASD Conduct Rules (hereafter NASD rules) 3010, 3030, and 3040 concerning supervision, outside business activities of an associated person, and private securities transactions of an associated person (see Spadafora affirmation, exhibit C). The case law reveals that the NASD rules, along with the New York Stock Exchange rules and the like, are in some cases only evidence of industry practice and "do not constitute an exemption from liability" (In re Blech Sec. Litig., 2003 WL 1610775, *4, 2003 US Dist LEXIS 4650, *10 [SD NY, Mar. 26, 2003]). In other words, if an entire industry fails to comply with the law while complying with industry standards, it is not thereby shielded from potential liability.
The rules of a private industry self-regulating group cannot deprive a state securities commission of jurisdiction over such an important area of securities fraud. Instructive on this point is Jones v Securities & Exch. Commn. (115 F3d 1173 [4th Cir 1997], cert denied 523 US 1072 [1998]), a case cited by FNIC. Jones ruled that res judicata did not bar the SEC from prosecuting an individual defendant after he had already been sanctioned by the NASD for the identical conduct (id. at 1180). The Fourth Circuit reviewed the statutory scheme for supervision of securities salespeople, among other issues:
"While the Exchange Act's methods for regulating fraudulent {**3 Misc 3d at 1002}and unethical conduct in the over-the-counter securities markets were originally limited to enforcement provisions for registration, inspections, and fraud prosecutions, those large-scale mechanisms were thought to be inadequate 'to protect the investor and the honest dealer alike from dishonest and unfair practices by the submarginal element in the industry' and inadequate 'to cope with those methods of doing business, which, while technically outside the area of definite illegality, are nevertheless unfair both to customer and to decent competitor, and are seriously damaging to the mechanism of the free and open market.' S.Rep. No. 75-1455, at [*19]3 (1938); H.R.Rep. No. 75-2307, at 4 (1938). Rather than expand the SEC bureaucracy to enforce the regulation of 'financial responsibilities, professional conduct, and technical proficiency,' in 1938 Congress elected to expand regulation through the enactment of the Maloney Act, 15 U.S.C. § 78o-3, which mandates industry self-regulation through the creation of registered national securities associations. S.Rep. No. 75-1455, at 3-4; H.R.Rep. No. 75-2307, at 4-5. The intent was to establish a 'cooperative regulation' where such associations would regulate themselves under the supervision of the SEC. Id.
"Under the Maloney Act, which amended the Exchange Act, registered securities associations are authorized to adopt rules which the SEC must, with limited exceptions, approve prior to their implementation and which the SEC may abrogate or amend as it deems in the public interest, consistent with the requirements of the Exchange Act . . .
"Following enactment of the Maloney Act, only the NASD, which is a private, nonprofit corporation organized under the laws of Delaware, has registered as a national securities association . . . In furtherance of its statutorily mandated role, the NASD adopted Rules of Fair Practice implementing its prescription that NASD members 'observe high standards of commercial honor and just and equitable principles of trade.' NASD Rules of Fair Practice Art. III § 1 (1992) (current version at Conduct Rule 2110, NASD Sec. Dealers Man. (CCH) ¶ 4111 (1996).
"In addition to the Maloney Act's authorization of the {**3 Misc 3d at 1003}NASD to discipline its members, the [federal statutes] explicitly authorize the SEC to discipline securities professionals directly. See 15 U.S.C. § 78o(b)(4) & (6); 15 U.S.C. § 80b-3(e) & (f). We have found no statutory, regulatory, or historical reference to support Jones' argument that NASD discipline of its members was intended to preclude this disciplinary action by the SEC itself against a securities professional. On the contrary, the SEC has repeatedly interpreted the Maloney Act not to inhibit its independent inquiry into improper practices . . . Indeed, the scope of sanctions that the two institutions may impose varies significantly in that the NASD's greatest sanction is merely to expel a member, revoke his registration, and bar him from association with NASD members." (Jones, 115 F3d at 1178-1179 [emphasis supplied and citations omitted].)
The SEC, on the other hand, like the State, may seek injunctive relief, restitution and criminal prosecution (id. at 1179).
There is a clearly defined space in this scheme for the State's regulatory role. "[T]he SEC administrative proceedings cover all markets and organizations and are designed to prevent and to punish more serious securities laws violations which, as the SEC determines, must be redressed in the public interest" (Jones, 115 F3d at 1180). State securities laws, including the Martin Act, are more directed to remediating harm to individual taxpayer/investors than to redressing broad market problems. In this climate, the court finds, the Attorney General retains a role with respect to securities salesperson supervision under the Martin Act.
The court notes that the parties have not cited nor has the court located any SEC regulations providing specific rules for supervision of securities salespeople. In this sense the area under concern differs greatly from the area at issue in Guice (89 NY2d 31 [1996]), disclosure of order call payments, an area which both the Congress and the SEC had minutely and carefully [*20]regulated (see Guice, 89 NY2d at 41-48).
Note further the recently enacted National Securities Markets Improvement Act of 1996 (NSMIA) (see 15 USC § 77r), which bars states from legislating with regard to registration of "covered" securities (e.g., those exchanged on a national basis). The NSMIA specifically preserves the authority of state securities commissions to "retain jurisdiction under the laws of such State {**3 Misc 3d at 1004}to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions" (15 USC § 77r [c] [1] [emphasis supplied]).
In consideration of the above, the court finds that there is no implied conflict preemption over the issue of salesperson supervision.

No Proof of Fraud Necessary

Further, the court rejects FNIC's contention that it cannot be held liable under the Martin Act in the absence of proof that it willfully committed fraudulent acts (mem of law at 19-24). The Martin Act does not require proof of scienter or intent to defraud to sustain civil liability (see generally Mihaly & Kaufman, supra, McKinney's, at 31; see also People v Photocolor Corp., 156 Misc 47, 52 [Sup Ct, NY County 1935]).

Standards Do Not Conflict

Finally, FNIC contends that plaintiffs' causes of action are preempted because plaintiff seeks to impose more stringent standards of supervision than those required by the NASD rules (mem of law at 17-19). That contention is without merit. Initially, as argued by plaintiff, and confirmed in SEC decisions, even the NASD rules require a higher degree of diligence in supervision under certain circumstances, such as where "red flags" exist, or where a branch office is remote from the broker-dealer's main office or includes personnel with a disciplinary history or who are inexperienced (see e.g. Rosen affirmation, exhibit K; Matter of La Jolla Capital Corp., 1999 WL 624046, *7 n 18, 1999 SEC LEXIS 1642, *16 n 18 [Sec & Exch Commn, Aug. 18, 1999], quoting SECO Sec., Inc., 49 SEC 873, 876 [1988]). In one case, the Federal Administrative Law Judge wrote: "We have often stressed 'the obvious need to keep [a] new office with . . . untried personnel under close surveillance' " (Matter of La Jolla, 1999 WL, at *4, 1999 SEC LEXIS, at *16; Rosen affirmation, exhibit K). Further, "[t]hat need is especially great when such an office is at a substantial distance from supervisory or compliance personnel" (id.). Even FNIC's Chief Compliance Officer, Jennifer Landefeld, testified before the Assistant Attorney General of her awareness of a "heightened" standard of supervision and admitted that FNIC had had representatives under heightened supervision before (see Rosen affirmation, exhibit N).{**3 Misc 3d at 1005}
In fact, the complaint alleges numerous bases for closer supervision. In 1995, Alan Justin, Jr. and Alan Justin, Sr. had signed a stipulation with the New York State Insurance Department agreeing to pay a $5,000 fine for having committed "numerous" violations of the Insurance Law (complaint ¶ 145 [a]). Most of the FNIC individual defendants were relatively inexperienced: Alan Justin, Jr. had never before served as a branch manager, until he assumed that position with FNIC; Yun Coughlin, Eric J. Justin, Patrick Justin and David Sada all had no more than two years of experience when first hired by FNIC. Jay Gianni, on the other hand, had been terminated from his last position for selling an unsuitable investment, and then became registered with FNIC in 1994. FNIC was his fourth employer in three years (id. ¶ 145 [c], [d]). Further, plaintiff alleges that FNIC business records show a decrease in sales of FNIC financial products from the time the FNIC individual defendants began selling the ETS Program; [*21]Jay Gianni accounted for approximately 80% of defendants' sales of the program during the period of FNIC supervision, and his sales of FNIC products declined approximately 90% during the period that he sold the ETS Program (id. ¶¶ 146-148). Plaintiff alleges that such declines were a clear indication that Gianni might have been "selling away," in other words, selling products not approved by his employer, but FNIC allegedly failed to investigate (id. ¶¶ 149-150).
Thus, plaintiff has stated causes of action against FNIC, and FNIC's motion to dismiss is, therefore, denied.

Footnotes

Footnote 1: Apparently the only defendants not to move or join in are Thomas F. Jung, T.F. Jung, Inc., Brian Marciniak, and William Schemm.

Footnote 2: Section 353 grants authority to the Attorney General to bring an action for an injunction against any person engaging in such fraudulent practices in the sale of securities, including a permanent injunction barring such person from selling securities in the state in the future (General Business Law § 353 [1]). Plaintiff also seeks to obtain restitution of any property derived directly or indirectly through such fraudulent practices (id. § 353 [3]). Plaintiff also seeks restitution and damages pursuant to Executive Law § 63 (12), and a civil penalty of $10,000 per defendant under General Business Law § 349-c.

Footnote 3: The pay phones are referred to at times as "customer owned coin operated telephones" or COCOTS.

Footnote 4: One woman who invested $7,000 was over 100 years old, a retired "charwoman" (Rosen affirmation, exhibit W). An 87-year-old investor purchased 21 pay phones through defendant Jay Gianni for $147,000 (id., exhibit B, Rosen affirmation ¶ 16).

Footnote 5: In the first through fourth causes of action in the complaint brought under General Business Law §§ 352 and 352-c (1) against all defendants except FNIC, plaintiff alleges, in the first cause of action, fraudulent practices; in the second cause of action, material misrepresentations and omissions; in the third cause of action, failure to provide an offering memorandum; and in the fourth cause of action, unsuitable investment recommendations. The fifth cause of action against Todd J. Justin, Todd J. Justin Agency, Inc., Alan Justin, Sr., Goldome Capital Management Inc., Alan Justin, Jr., and Justin Financial Services, Inc., alleges that those defendants violated the registration requirements of General Business Law § 359-e and thereby engaged in fraudulent practices, specifically by directing or permitting the sale or offering of securities to the public of an unregistered issuer by an unregistered broker-dealer. The sixth cause of action against Todd J. Justin, Todd J. Justin Agency, Inc., Eric Justin, E. Jonathan & Company Inc., Patrick Justin, Pat Justin Agency, Inc., Jay Gianni, Mary Beth Gianni, Gianni Financial Services, Inc., David Sada, D.M. Sada, Inc., Michele Sada, Yun Coughlin, Jae-Yung, Inc., Ronald Mueller, Thomas Jung, Thomas F. Jung, Inc., Brian Marciniak, William Schemm, and Michael Crystal alleges that those defendants sold or offered to sell to the public securities of an unregistered issuer through an unregistered broker-dealer, Goldome Capital Management. The seventh cause of action against FNIC alleges a failure to supervise its securities salespeople as a violation of General Business Law §§ 352 and 352-c (1). The eighth cause of action against Alan Justin, Jr., as branch manager of Justin Financial Services, alleges a failure to properly supervise securities salespeople constituting a violation of General Business Law §§ 352 and 352-c (1). The ninth cause of action against Todd Justin, Todd J. Justin Agency, Inc., Alan Justin, Sr., and Goldome Capital Management Inc., alleges a violation of General Business Law § 359-e and fraudulent practices under General Business Law § 352 (1) by employing unregistered salespeople. The tenth cause of action against Todd Justin, Mary Beth Gianni, Michele Sada, Thomas Jung, Brian Marciniak, William Schemm, and Michael Crystal alleges that each of those defendants sold and offered to sell securities to the public but failed to register as securities salespeople. The eleventh cause of action alleges that Goldome Capital Management Inc., Todd Justin, Todd A. Justin Agency and Alan Justin, Sr. failed to file a registration statement prior to selling securities through Goldome Capital Management.

Footnote 6: Todd Justin is president of Todd J. Justin Agency, Inc.; Alan Justin, Jr. is president of Justin Financial Services, Inc. (JFS); Eric Justin is sole shareholder, officer and employee of E. Jonathan & Company, Inc.; and Patrick Justin is sole shareholder, officer and employee of Pat Justin Agency, Inc. 

Footnote 7: Viacom was formed by Alan Justin, Sr. and Todd Justin in April 1998 and changed its name to GCM in September 1999 (complaint ¶¶ 45, 50). To simplify, the entity will be referred to as GCM throughout.

Footnote 8: The Todd Justin Agency, Inc., GCM, JFS, E. Jonathan & Company, Inc., and Pat Justin Agency, Inc. all have their principal place of business at 3260 Walden Avenue, Depew, New York.

Footnote 9: In October 1999, NPC directed Alan Justin, Jr. to instruct his salespeople to cease selling the ETS Program. NPC had learned that the National Association of Securities Dealers (NASD) was investigating certain ETS sales materials defendants were using (see Rosen affirmation ¶ 34; see also exhibit R [NASD investigating Viacom Settlement Group, predecessor to GCM]). According to plaintiff, NPC forbade defendants to sell the program until May 2000, at which time the NASD terminated its investigation. However, according to plaintiff, the registered securities salespeople who are defendants herein continued to sell the ETS Program during this entire period and concealed the sales from NPC (see complaint ¶¶ 99-100).

Footnote 10: The NCMI marketing materials quote the newspaper USA Today: "There are millions to be made from owning payphones" (Gaglione affirmation, exhibit F, NCMI materials [unpaginated]).

Footnote 11: Rosen undertook the investigation for the Attorney General leading to the instant lawsuit (Rosen affirmation ¶ 3). During the course of the investigation Rosen took testimony from 25 investors, spoke with many others and took testimony of all of the defendants; he reviewed numerous records including certain business records of the Justin defendants.

Footnote 12: There were other companies such as Phoenix Telecom LLC and Charter Telecom LLC which offered similar sale/leaseback transactions. Note that Phoenix Telecom, a pay phone management company similar to ETS, closed its doors early in 2000 and its leases were assumed by ETS (State of Iowa ex rel. Miller v Pace, Iowa Dist Ct, Sept. 2002, Equity IA26445, slip op, at 6 [attached to plaintiff's mem of law/Justin motion]). Alpha Telecom also filed for bankruptcy (id.).

Footnote 13: According to the Iowa case of Pace, ETS in bankruptcy proceedings "made public its position that COCOT purchasers did not own payphones and pursuant to ETS's motion the bankruptcy court made a determination that the payphones were owned by ETS" (Pace, slip op at 6, Rosen affirmation, exhibit E).

Footnote 14: General Business Law § 352-c (1) is a criminal provision under the Martin Act and provides that "[i]t shall be illegal and prohibited for any person, . . . or any agent or employee thereof, to use or employ any of the following acts or practices: (a) Any fraud, deception, concealment . . . ; (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances; (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase . . . of any securities . . . as defined in [section 352] . . . ."

Footnote 15: Section 20 (a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action" (15 USC § 78t [a]).